Good morning, Your Honor. May it please the Court, my name is Amy Vandervelde, and I represent the Pellant and Cross-Appley Marizio Antoninetti. And this case, Your Honor, is about one man's quest for the Chipotle experience. Would you please speak up? Sure. This case is about Mr. Antoninetti, who is a paraplegic, and his interest in having the Chipotle experience. The Chipotle experience is something that's completely different and unique to Chipotle restaurants. It's not like a Taco Bell, it's not like a Del Taco, where you go to a window and you order your item off of a menu board, and you get something wrapped up and you take it home. The Chipotle experience is intended to provide the wow factor. It provides an opportunity for people to see, select, and direct the making of their burritos. They get to see a 12-foot-long display of 16 bins filled with wonderful-looking food. There's not too much emotion or dramatics over this experience. But, Your Honor, it's important that the Court understand what – It is a stipulation to how exciting it is to have this experience. Well, it's important that the Court understand what is unique about this Chipotle experience, because unlike Del Taco and Taco Bell, Chipotle wants its customers to look into the open kitchen, to be brought more completely into the dining experience, to actually participate in the making of their burrito. Though all of those intended benefits require an opportunity to see into the kitchen, to see the display of food, to be able to determine which item you want over another one, how much of an item you want, that all is the Chipotle experience. It's a material part of the Chipotle experience, and that's what this case is about. And that's not duplicated by employees bringing little bowls of things and showing them to you. That's your point. Absolutely, Your Honor. It's not the same thing. If you look at Caruso v. Blockbuster, the Court said just because you have seating in an interior pavilion and you may consider it to be a better experience, that doesn't make it a comparable experience. That doesn't provide equal facilitation, because you're providing a different and separate experience. What Chipotle provides is different. It's not looking at a 12-foot-long expanse of food. It's looking at a little tray with 12 little or 16 little small cups of food, either at the cashier station, as they say that they will do, or at a table in the dining area. Now, hopefully you get the accessible table in the dining area, but if you have that experience, you're pulled out of the line. You go to the dining table, potentially the accessible one. They bring out a tray of food. They plop it on your tortilla. You may say, oh, no, I want a little bit more barbacoa. They have to go back into the kitchen to get that item. Come back. Finally, they wrap your burrito. You take it back against traffic to the cashier counter to pay for it. That's a completely different and a completely separate experience, and that's not allowed as equal facilitation under the ADA. You described it very well in your brief. I'd like to ask whether or not you have any cases backing up your argument that the cash register counter is not a part of the main counter, nor an auxiliary counter. Do you have any cases on that issue? I could cite the cases that Judge Jones referenced in his ruling on the motion for summary judgment, where he found that because there are different experiences along the 12-foot-long foot display and at the cashier counter where you pay for your food, that it's not part of the main counter. They don't provide the same sort of thing. Our position is even if they brought a tray of 12 samples of food to the cashier counter, it's still not the same experience. It's not. It's a separate, and it's a separate. I understand your argument. I just wondered if you had any cases on point. No. And as a matter of fact, Your Honor, Judge Jones said in his ruling that he couldn't find any cases that addressed the sort of counters that are at issue in this case. And my question was, did you find any? No, Your Honor. And that's why this case is so important. This case is not just about the Chipotle experience for Mr. Antionetti. It's about a couple of different things. It's about what is the definition of ADAD 2.2, the equivalent facilitation. What does that mean? It's also about when you have a novel situation that may not be specifically addressed in the ADAD, how do you analyze the standards? How do you apply them, and how do you interpret them? And I think this Court said in Regal Cinema, you interpret them broadly. If they can be applied, they should be applied. This Court said that it's not whether, if I could read from Paralyzed Veterans v. Regal Cinema, the issue is whether a broadly drafted regulation with a broad purpose may be applied to a particular factual scenario, not expressly anticipated at the time the regulation was promulgated, a question that the Supreme Court has answered in the affirmative. And that's what we're saying in this case. There is a statute, a standard on point, that would provide a line of sight, not only to the Chipotle experience, but also to displays in museums or televisions and sports bars. You have to look at 4.33.3, which provides a line of sight and which relates to assembly areas. Assembly areas are defined as rooms or spaces, which could be outdoor spaces, that accommodate What kind of relief were you seeking? You wanted them to get rid of the whole wall or just the top eight inches of it? Or could they substitute glass for part of it? They can do anything they want, as long as that design provides a view of the food viewing area and into the open kitchen, so a person in a wheelchair gets to do the same thing as a standing person. We don't care how they do it. All we're saying is when you initially constructed this facility and you had a wall that was 46 inches high, so that the only people that can't see into the kitchen are people in wheelchairs, that was a violation of the ADA. It violated the purpose and intent of the ADA. Now, if the wall were only 36 inches high, that would not violate the statute, would it? That's exactly right, Your Honor. And as a matter of fact, that statute, the 36 inches high counter, is intended to provide access for people with disabilities where they have to look at things, sign credit card receipts, that sort of thing. If you can see the top of the 36 inch counter, which is anticipated and assumed by that height requirement, you can see into the kitchen. But that's not what Chipotle did. They put up a wall and they did it because it was aesthetically convenient for them. It matched the interior of the dining walls, the wainscoting. They say that in their responses to the supplemental statement of undisputed facts in support of the motion for summary judgment, where we say the wall has no functional purpose. And they say, well, it has a functional purpose. It prevents people from seeing the foil and the utensils. Well, the only people that can't see those are people in wheelchairs, because if you're a standing customer, you can see those things. They also said it's consistent with the wainscoting in the dining area. I don't recall it in brief, but I assume your position is you're entitled to an injunction without more. Well, we're actually asking for a couple of things, Your Honor. We're asking for a ---- I said you're entitled to an injunction without proving anything else once you prove the violation. I'm sorry. Could you repeat that, Your Honor? I didn't understand the question. Once you prove the violation, that is more than the regulation to provide, higher, you are entitled to an injunction? Absolutely, Your Honor. All right. That's all I wanted to know. And I do say the court under this statute is not required to consider the four traditional factors governing the issuance of injunctions. Is that right? That's exactly right, Your Honor, because when you have a statute that provides mandatory ---- that says you shall take remedial measures to remove the barrier, then that's a mandatory injunction. For that proposition, you rely, among other things, on the unusual fact that this statute does not provide for damages. The only relief that this statute creates is injunctive relief. That's correct, Your Honor. But when you have new construction, when a statute says that it provides for injunctive relief, if you provide, if you prove a violation of that under the trailer and the train case, then you don't have to prove ---- there's no balancing of the equities. And it should be ---- in this case, it makes sense. A plaintiff shouldn't have to say, well, now, I'm going to get your plans and figure out how much it's going to cost to remove a barrier, when you should have done it correctly in the first place. When cost is not a defense in the first instance, it shouldn't be an affirmative defense or an obligation of the plaintiff when they're seeking a remedy. And I ---- Are there any cases still holding that you're entitled to an injunction just by showing a violation of the statute? Yes, Your Honor. You're not considering the four factors. You don't have to cite them to me. Just tell me, let me know the answer is yes or no or I don't know. Tennessee Valley Authority and Trailer Train Company, Your Honor, which were actually addressed by the Court this circuit in the Long v. Coast Resorts case, where the Court said, we're not reaching the issue of whether or not we even have the discretion to determine whether or not we should weigh the equities, because in this instance, there is no discretion. And I would say in this case there is no discretion either. Pardon me. Because the only way that a person with a disability can see into the Chipotle experience, experience the Chipotle experience that we're asking for, is if they lower the wall. So there is no discretion. If there is another way, then Chipotle should have offered that as another opportunity. But from what we can see, the only way to provide that is to lower the wall. Costs then should not be a factor. The Court has no discretion to consider otherwise. And that's the Long v. Coast Resorts case, Your Honor. Is the BQIS going to argue? Yes, Your Honor. I think we've started with enough time. All right. Oh, I'd like to reserve the last minutes of my time, please. OK. They only gave the time. They set the time for her. Good morning. May it please the Court, my name is Amy Robertson. And I represent the Disability Rights Education and Defense Fund and six other amici who have written to address a single question in this lawsuit. And that is whether staff assistance can ever constitute an equivalent facilitation and excuse compliance with the physical architectural requirements of the ADAG. Here, the Court held that it could. It held that Chipotle's policy of holding up pieces of food or sort of running back and forth and assembling burritos elsewhere could be an equivalent facilitation and excuse the required lowering of the counter. In fact, this is in fact only where there are alternative designs and technologies is an equivalent facilitation permitted and full physical compliance excused. The amici wrote because we were quite concerned with arguments that we were seeing in this case and others concerning where that might go, where that holding could take us. Our concern is it really essentially collapses the distinction between new construction and existing facilities. Existing facilities can avoid barrier removal where it's not readily achievable and then provide quote unquote alternative methods. But existing facilities, you mean facilities that were existing at the time of the act? Exactly, Your Honor. It predated the effective date of January 26, 1993. And these buildings were built after the act? Exactly, Your Honor, yes. Assuming that we agree with you and I'm not saying that we do, do you have any suggestions as to any guidelines that would be particularly helpful to the District Court in crafting an injunction? In this particular case? Yes. In this particular case, I believe the appropriate injunction would be to lower the counters to 36 inches as required by the ADAG and not to permit either the old or the new customer service policy to be considered an equivalent facilitation under ADAG 2.2. You could raise the floor and put in a, I don't know, sort of something that people could go across including wheelchairs. Yes, that would have the same effect. I agree that that would be a. I don't know whether that's possible. But as long as the distance between where the people go across and the top of the counter were only 36 inches. Well, exactly. Or as was suggested in the party briefs, an alternative design or technology might be keeping the counter at 36 inches and having a transparent wall. The counter itself, as I understand it, is at 36 inches. It's a wall that prevents the visual access. And if that wall were transparent, that would provide the visual access and it would be an alternative design or technology appropriate under Section 2.2. Is the wall something that can be taken down without? That's my, that is my understanding. I'll defer to the party attorney to address that, my colleague. But yes, the counter, as I understand it, the counter on which the work is performed is at 36 inches, there's simply a wall that prevents. I'm looking over to, we can still address this with more specificity. Do you claim, do you contend that the doctrine of equivalent facilitation applies only to old construction and not to new construction? Respectfully, no, Your Honor. Exactly the opposite. The doctrine of alternative methods can be used only in existing old construction. Alternate. Well, I don't understand why that should be, why it can't be used in new construction if the result of using it is to provide equivalent or perhaps superior facility. Under no circumstances, Your Honor, amici argue, under no circumstances is a reliance on a policy or a practice ever going to be equivalent to ordained physical access for a number of reasons. First of all, when you, let me get something clear. When you talk about equivalent facilitation or whatever it is, your position is that that means physical, equivalent physical. Precisely. Construction or whatever it is. It's got to be something physical to be equivalent design or equivalent facilitation. Exactly. Whatever it is, that's what you're. That is the, that is the. If it's already in existence before, when the act passes, then you can do what? Under a separate statutory provision, 121B2A5, the, where barrier removal is not readily achievable, alternative methods may be used. And those are defined as customer service methods, curb service, retrieving merchandise. But only in existing facilities is that route permitted. That term, alternative methods, was first used in the new construction provision in 2.2 of the ADAG. The drafters at the access board took it out. Not, they said it's not going to be alternative methods, which is defined as customer service, but alternative designs and technologies. It was a very specific decision that in new construction, the only exception is for designs and technologies. And the, the reasoning for that is to allow designers and inventors to come up with better physical access. Not to excuse the lack of physical access with a customer service. The latter, the latter problem relates to facilities that violated the law when they were built, and the others were in compliance with the law when they were built. Is that the distinction? The distinction is between older facilities, and I apologize if I'm not perceiving the court's distinction. Older facilities which were in compliance with the law when they were constructed. An older facility that's in compliance with the law doesn't have to worry about this. No, no, it was in compliance with the law, not with the ADA, but was legal at the time it was constructed. And the second part that we're talking about, where you have to make physical changes, relates to construction that was in violation of the law when it was constructed. The, the two provisions, the one allowing customer service workarounds, applies to facilities that were built before 1993. So they were in compliance with the law when they were constructed. They were in compliance with, there was no law applicable at the time. There's no law that was. And they may have been in compliance with local building codes. All right, forget that, I'm sorry. But they were generally in compliance with the law when they were constructed. And the one that requires physical changes has to do with construction that did not comply with the law at the time it was constructed. And that, yes, exactly. And that's only permissible where the alternative, where the so-called equivalent facilitation is itself an alternative physical design or technology. And it's not something where a design can be done that is, that is not compliant in the hope that a later policy will be implemented that might provide a kind of ad hoc accessibility. That, now that the ADA is in place and, and you've got some, a law that says, you've had, now you've had 20 years almost, you've got 20 years to get ready. Now when you build, you really have to build in compliance with the ADAG or you have to have an alternative design or technology that provides equivalent or greater access. It's only when you're looking at a building built before you had access, before the designers and builders had access to the ADAG, it didn't exist yet, where you have to remove barriers, then maybe, maybe you can use customer service as a workaround. Okay. Thank you, Your Honor. Bob, please wait. Yeah, the other thing, he says tomorrow. Anyway. The seven minutes. Oh, I think so. Good morning, Your Honors. My name is John Scully of Greenberg Traurig on behalf of Appley and Cross Appellant Chipotle Mexican Grill. May it please the Court. Can I just ask you a question here? Yes. This building was after the act. That's correct. Is there anything in the record that shows where you went ahead and built the building the way you did? I'm not sure if there's anything in the record below specifically on point. I offhand don't recall there being any testimony at trial on that point, other than it was primarily a design feature, and also in particular to make sure that certain utensils that were on the serving counter, the employee side, would be concealed from the customer's view. It just looked better. And also from a health and safety standpoint, there was a concern that if you had a counter too low, people could reach over and breathe, you know, and sneeze on the food. But it was new construction. I think it's important in response to that question to take a step back. May I ask you two further questions along that line? First of all, is this wall functional or is it just decorative? You say it's functional to prevent people from reaching over and grabbing something? That's correct. That's okay. And then my second question is why did they build it 44 inches up when, if they had built it only 36 inches up, they wouldn't have had this litigation? That was exactly the point I was just going to get to, Your Honor, and I thank you. There is nothing in the ADAG, in the Department of Justice's regulations, that says that this wall needs to be, it can be no more than 36 inches in height. And, in fact, the provisions, I think it's very helpful to look at the regulations and how they're set up. 5.5, or Section 5, deals with restaurants and cafeterias. And it deals primarily, it has a Section 5.5 that deals particularly with food service lines, which is what we're talking about here. And it talks about the dimensions of the aisle, and it has to be a certain width. It talks about if you have a tray platform, that that needs to have certain dimensions to it. But nowhere does it talk about it needing to be a certain height or that there needs to be a line of sight requirement there. And then if you look at Section 7, which deals with businesses and mercantile, and which courts have held applies to restaurants like Chipotle, Section 7.2 deals with the, you know, when you have either an auxiliary counter or one main counter where there can be multiple purposes. And it specifically says that you can do one of three things. And I think it's undisputed in the facts below that Chipotle's food service line is covered under 7.7. It is one long line, one long counter, and at the very end of it, there is a lowered section with a cash register, and it is 36 inches. It complies with the 36 height requirement. And there was testimony, there was evidence presented below, that that lowered section of the main counter is capable of being used to show customers the food that they could otherwise see along, you know, the rest of the counter, to prepare their entrees in front of them. And that goes to 7.7, I'm sorry, 7.22 small i. And so that's one thing you can do. As long as you have one part of the counter that meets the height requirement, you're okay. As long as it's capable of being used for the same purpose as the food prep line. And then if you don't, if you can't do that, then under double I, you can have an auxiliary counter. And our position is that you don't even need to get to double I because we comply with, we fall within the single I. But even if this Court were to somehow find that single I doesn't apply, it is, I think, beyond dispute that there is an auxiliary counter there, the transaction station, where you can provide the same services that were going to be provided along the food preparation line. That depends on how you define the word same service, doesn't it? Because as I understand your opponent, opponent says, what he complains about is that because of the wall, he cannot see the food the same way that people who are not in wheelchairs could see it. He can't, there's no way, he can see from his, either from the lower level of the place or from his wheelchair that he can look and say, that bowl, that batch of that stuff doesn't look so fresh, but that looks very good, I'll have a little more of that and so on. He says it's not the same thing as looking at the table with all of these foods to have someone hold up to you a sample of this and a sample of that. The standard is that it needs to be substantially equivalent, so substantially the same. I would submit that it is at least substantially the same. In some instances, in some respects, it may even be better because you're not looking at one big vat or tray of food and not knowing exactly what portion of the guacamole you're going to get. Are you going to get the brown stuff on the side or are you going to get the good stuff in the middle? If it's brought over to the auxiliary counter or to the expo station on the side, it's going to be brought to you in a sample serving in a plastic cup that is exactly the same serving size as what you would get on the line and you're going to see exactly the guacamole that you're going to be given. If you don't like it, then you can ask for a different guacamole or not have it. In some respects, at least, it's even greater. It's, in fact, preferential treatment. And I also point out that under 7.22 IIII, the regulations specifically identify it as an example of an equivalent facilitation in the context of a hotel registration desk. If the hotel registration desk is not compliant, is not accessible, one of the examples of an equivalent facilitation is that you can bring the hotel guests, when they're checking in, you can bring them over to the concierge desk and check them in there. That, to me, is a much different. It's not really a very enjoyable experience to check in at a hotel. It's almost like going to get to an airplane these days. This is a wonderful experience, I gather, this Chipotle experience. It is. It is, Your Honor. Oh, I'm sure it is. It's a wonderful restaurant. I'm sure you eat there all the time. I take judicial notice of that. But it's stipulated that he wants to have this wonderful experience of going through this line like everybody else and seeing what's going on. And that's really not like checking in at a hotel where you can check in at a different place. Nobody particularly enjoys the experience of checking in at a hotel. I think that it is analogous to checking into a hotel in the sense that when you go to a hotel, you don't go there to check in. You go there to get a room and to sleep. And many hotels try to make the experience of checking in as good as possible and the overall hotel experience as good as possible. But at the end of the day, what you're doing, and literally at the end of the day, you're going there to sleep. Same with Chipotle. When you go there, you're not going there to... I don't think they'd agree with that from what I hear. They want you to have this wonderful whole experience of marching along the county, and actually seeing the foods back there. Of course. But again... But counsel, if I want a burrito, I go in to get a burrito, and somebody brings me out a little plastic cup of guacamole, or they bring me out a little plastic cup of beans or something, knowing the amount. I don't get the experience, do I? I mean, we're talking about design, the wow experience of looking at this wonderful array of food and knowing that I can have anything I want, anything I choose to have. You seem to emphasize that when you get the plastic cup, you know how much you're getting. But isn't the experience of looking at the array of food and the array of possibilities what they call the wow experience? I will concede that seeing the food in the line is a part of the Chipotle experience. But I think Appellant overstates that. Probably the Appellant is the only thing that makes them overstate it. I hope that's not a question I have to answer, or that it was a statement. But, Your Honors, the evidence below was that the Chipotle experience, the wow factor, is a lot of different things. The visual elements are certainly part of it, but the noises, the smell, the commotion, all of those things are also part of it. And I'd also point out that there are many standing customers who are too short to see over the wall, who also can't see the food. But they're still going to be able to experience the Chipotle experience. What do you do with those short people there? The same thing you do with someone in a wheelchair. You give them the options. You let them know, we can take you over here, and we can prepare the food at the lower section of the counter at the expo station. We can take it to a dining table and prepare it for you there. Same thing. They're not disabled, those short people. I don't know. All of this, I think, is a fair question of what makes good public policy. But when you look at the ADAX requirements, there's nothing that puts my client on notice when it's building this facility that it is somehow violating the law by having the wall a certain height. When it looks at the requirements, it looks at the regulations, and it goes to Section 5, and it says, oh, I'm in compliance with all this. It goes to 7.2. I'm in compliance with this. The only thing that appellant is citing and urging the court to focus on is 4.33.3, which it has to do with it's in Section 4.33, which deals with assembly areas. And the assembly area is defined in the regulations as a room or a space with a group of individuals who are gathering together for recreational entertainment purposes, et cetera, or for the consumption of food. And so just on its face, Section 4.33, assembly areas, doesn't govern the food preparation line. People aren't assembling there to consume food. They're standing in line to get their food so they can consume it somewhere else. And all of the case law that's dealt with 4.33 has dealt with that in the context of movie theaters, arenas, places where you go to that actual movie theater to see the movie. And so therefore, of course, it makes sense that there be a line-of-sight requirement there. I'm unaware of any case that has taken 4.33.3's line-of-sight requirements and applied it as the court is being urged to apply it here. As a matter of public policy, it may make all the sense in the world to revise the regulations and maybe put something into Section 5 that deals with restaurants and cafeterias and specifically addresses food service lines to specifically make it clear that you need a line-of-sight. Didn't the district court rely on 7.2? Pardon me? Didn't the district court rely on 7.2? The court, 7.2 has three components. I was just asking whether the district court relied on 7.2. Yes. On summary judgment, the district court rejected our arguments that 7.2 to small i and small double i govern this situation. And then on summary judgment, and it's a question of fact as to whether subsection triple i, which deals with the equivalent facilitation, whether that would apply here. And that's a question of fact that needs to be tried. And so we had a bench trial on that issue. And the court held after trial that 7.2 to triple i governed and that Chipotle's policy of providing accommodations satisfied the requirements of triple i because it was a policy that provided an equivalent facilitation, in other words, a substantially equal or greater Chipotle experience. But he didn't rely on Section 4, did he? He rejected the argument that 4.3. But you've been arguing Section 4 in agreement with the district court. Correct. My only point was that there is nothing in the ADAG that would put my client or a builder or a designer on notice that you need to have, you know, the wall be a certain height, that it can't be more than 36 inches on a food preparation line.  And so that brings me to the point of injunctive relief. I mean, we can speculate here. I mean, I can speculate. Appellant's counsel can speculate as to what would be the appropriate remedy, whether to tear it down or whether there's some other design feature. But speaking for myself, I'm not an expert. And that's why I think it makes sense. And this is what Congress has done. It's enacted this statute, and then it said, Department of Justice, you're responsible for implementing regulations. And there is a process in place. The regulations are proposed. The public has an opportunity to comment on them. Chipotle would have an opportunity to present its position to the Department of Justice. People like Mr. Antone could do the same thing. Organizations like the amici, in this case, could do the same thing. But in the absence of that process, we're in the dark here as to what the appropriate remedy would be. Well, that's why we have district judges. That's right. And certainly the Justice Department could follow amicus as to what would be appropriate remedy, assuming that we remanded and asked the district court to devise an appropriate injunction. You'd have lots of time for this argument. I assume I'm not going to tell the district court how to tell your client to comply. That's what the district court would decide. Your Honor, if I may address one of the points that counsel for the amici made, which was that there's some distinction between new construction and existing construction. I don't see anything in the ADAG that supports that position, at least with respect to the issue that we're dealing with here, which is whether there needs to be a line of sight along the food prep line. And, in fact, if I can point the Court to Section 2.2 of the regulations. 2.2 is just a general, it's entitled general, and it's just a general sort of policy statement in my view. 2.2 is an equivalent facilitation, and it says departures from particular technical and scoping requirements of this guideline by the use of other designs and technologies are permitted where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility. It says departures from, which to me at least implies that it's talking about new construction as well as existing facilities or existing construction. If you're building a new, you're designing and building a new facility, and you are going to depart from the particular design and scope or the technical and scoping requirements set out in the ADAG, you can do that as long as it provides an equivalent facilitation. You can do it as long as what alternative designs and technologies provide an equivalent. Right. You think that covers written policies? No. No, the point I was making was this distinction that Counsel for Amici was making as between new construction where you can't have a policy, according to Amici, and existing construction where you can. And my point is I don't see anything in the ADAG that really makes that distinction. You would read it as if a court construed that section as requiring actual physical designs to be changed, such as requiring this counter to be changed physically instead of with a written policy. The same thing would apply to buildings that had already been constructed before the Act? If I understand your question, yes, that it applies to both existing facilities and new construction, that you can have a policy for new construction. And my point in focusing the Court's attention to 2.2 is that it talks about departures from the ADAG requirements. And it says you can build a new construction that departs from these particular scoping and technical requirements, but if you do, you need to make sure that they provide equivalent facilitation. And then if you go to 7.22333 or III, that specifically sets forth, and is an example of equivalent facilitation, a policy, namely the policy of taking the wheelchair user at the hotel registration desk and taking them over to the concierge desk to check them in. That's a policy. Well, that's a facility, physical facility where you can check them in. It's a physical facility that wouldn't otherwise be in compliance, and then you have a policy that gets you into compliance by taking you from that. If the hotel registration desk is not compliant, you're still okay if you have a policy that takes the guests to the concierge desk. Which will provide substantially equivalent or greater access to. Correct. I'm not sure how that argument helps you then. If the question is, is it substantially equivalent? Right. I mean, I think I've addressed that point perhaps as best I can. I think in this case, and certainly more than the example that the Department of Justice gives in the regulations or that the Access Board gave in III dealing with the concierge desk, I think that the policy here does a much better job of providing the same experience. And I submit it's a substantially same facilitation. I hope you don't have any clients with buildings that are facilities that don't comply, that were constructed before the Act. I do not, Your Honor. But you'll get a lot of clients. That's right. But, again, the point I think that should not be lost is that Congress has set forth a process here. And there are significant due process concerns if this court were to issue an injunction saying or define that Chipotle is not in compliance with the ADAG, when there is not a specific provision in the ADAG that the court could point to and say that Chipotle is violated. And then it's only a matter of how does Chipotle know if it's in compliance? If it looks at the ADAG and it looks at all the provisions of the ADAG that on their face and based on the plain language of the regulations, they appear to apply to the food service line and it appears that Chipotle is in compliance with those. Now, what the appellant is asking this court to do is to say, ignore all the actual specific provisions of the ADAG and just go on the general anti-discrimination provisions of the ADA. And that, I think, that would undermine the very purpose that Congress has, Congress's purpose of having the Department of Justice implement these regulations, if you could just go outside of the regulations and find a violation. Thank you, Your Honor. Thank you. Thank you, Your Honors. It's not true that there's nothing in the ADAG that doesn't apply to the Chipotle restaurants. As a matter of fact, as we've argued, 4.33.3 does apply. 4.33.3 is under a section entitled Assembly Areas. The drafters of the ADAG gave assembly areas a definition. They defined it as counsel said, a room or space where people gather for political, educational, amusement, or social purposes or for the consumption of food and drink. Consumption of food and drink is a restaurant. Museums are places where people gather for educational purposes. Sports bars are places where people gather for social purposes, perhaps. All of those are assembly areas. The drafters of the ADAG then went on to say, in these assembly areas you must provide wheelchair areas, where people in wheelchairs can be part of the group, can experience the same thing at all of these other assembly areas. And the drafters said, in these wheelchair areas, if you have a fixed seating plan, you have to make wheelchair areas integral to that plan. The reading that we subscribe to for 4.33.3 is a broad definition. It furthers the purpose of the ADAG. But the district court relied on section 7.2, right? Well, whether or not you rely on 7.2 or 4.33.3, I think that's the case. Let me ask you another question, because we've got a minute and a half. Where do you find the distinction between pre-Act construction and post-Act construction? Well, actually, the purpose of the ADAG is set forth in section 1, and it says the purpose of these guidelines are to be implemented during the design and construction of facilities. That is intended to apply to new construction. When you then apply the ADAG, you have to follow the guidelines, unless you provide equivalent facilitation, which must be an alternative design or technology. It cannot be a method of adopting, a policy of adopting methods of accommodation to overcome the inaccessible design that you created. Chipotle had guidance in this case about how it could have and should have built. Well, I understand that. But what tells you what applies to buildings that were already constructed? Actually, Ms. Robinson can address that, Your Honor, if that's all right. Okay. We've got half a minute or so. In the statute itself, in section 12183A, 8A1, the statute instructs that buildings that are designed and constructed for first occupancy after January 26, 1993 must be built in conformance with the ADAG. And the regulatory site that then ties that to the ADAG is 28 CFR 36.406, which instructs reference to the ADAG. In a later statutory provision, 12182B2A4, the statute instructs that in existing facilities, barriers are to be removed where it's readily achievable to do so. So in the statutory language, there's a distinction between pre and before and after January 26. Thank you. You gave us the sections. Thank you. If I may, one quick response now that I'm up here, if I could. You can do it in 30 seconds. I will. Mr. Scalia noted, talked about the fact that design and technology provision 2.2 permitting alternative designs or technologies, that, in fact, applies to new and old. He's right about that. What does not apply ever in new construction, which is what we have here, is alternative methods, is being able to use policies instead of alternative designs and technologies. So that is the distinction. Thank you, Your Honor. Thank you. The case just argued will be submitted. Thank you all very much. Thank you.
judges: Friedman, Nelson D. W., Reinhardt